Alan FOXX, Individually and d/b/a
Ultimate Rides and/or PMI and
Ultimate Rides Co., Appellant,

v.

Ray DeROBBIO, Appellee.

No. 08–03–00522–CV.

Court of Appeals of Texas,
El Paso.

June 16, 2005.

Rehearing Overruled July 27, 2005.

---

John P. Mobbs, El Paso, for appellant.

Mark T. Davis, El Paso, for appellee.

Before BARAJAS, C.J., McCLURE, and CHEW, JJ.

### OPINION

ANN CRAWFORD McCLURE, Justice.

This is a dispute arising from the restoration of a 1971 Barracuda. In his suit for breach of contract, Ray DeRobbio was awarded a judgment for $66,083 plus attorney's fees and interest. In two points of

error, Alan Foxx complains of the sufficiency of the evidence to support the damage award and challenges DeRobbio's qualifications to offer an opinion that the repair expenses he incurred were reasonable. Finding no error, we affirm.

## FACTUAL SUMMARY

Ray DeRobbio is a car enthusiast from Atlantic Highlands, New Jersey. In the late 1990s, he became interested in finding a 1971 Barracuda. After scouring local newspapers, DeRobbio found a copy of Hemmings Motor News, a national publication featuring a section on Barracudas. An advertisement by Ultimate Rides Company indicated that the company had four Hemicudas in stock. In August 1998, DeRobbio called the number in the ad and spoke to Alan Foxx about the restoration of a Barracuda. DeRobbio told Foxx that he wanted the car to have a nostalgic look to it but he wanted it equipped with all the modern upgrades. Foxx faxed DeRobbio a bill sheet reflecting various upgrades together with two magazine articles mentioning Foxx's work on engine power, brake power, and paint jobs. DeRobbio later received a magazine containing an article entitled, "Hemicuda Done" describing flawless car crafting efforts by Ultimate Rides.

DeRobbio entered into a purchase contract for a 1971 Barracuda convertible to be restored in accordance with buyer specifications and to be completed within five months at a cost of $57,172. The base price for the ground-up turnkey car restoration was $24,500. On the option list, DeRobbio chose a 440 cubic inch 500 horsepower engine for $850, a Richmond 6–speed transmission for $4,850, a handling package and quick ratio for the steering box, Baer 4–wheel disc brakes for $2,250, a 1971 standard color called plum crazy, a shaker hood for $3,800, custom rims, and mirrors painted to match the car. The terms of the contract required a down payment of $34,000 with the balance due upon completion. DeRobbio was to pay for shipping.

Two months later, DeRobbio traveled to El Paso to see the company facilities and Foxx's own restored car. He met with Foxx and Brett Danberry, an employee of Ultimate Rides, and learned that restoration of his car had not yet begun. After seeing the options on Foxx's car, DeRobbio prepared an ancillary list of options costing $1,751.99.

DeRobbio did not receive the car until fifteen months after he signed the contract. When it was delivered, it could not be removed from the trailer. DeRobbio sought help from Keith Mitterman, the owner of a repair shop in Atlantic Highlands, in order to get the car off the trailer. When DeRobbio inspected the car, he noticed it had a thirty-year old convertible top with rusted staples. The paint on the back looked like it had sand in it. The front fender had an indentation. One of the headlights was missing its molding. The hood was off center and had gouged the fiberglass. Inside the car, the heater box was completely split open and the fuse box was dangling. The wing of the car was not properly secured. DeRobbio also had difficulty in opening the trunk and then found it full of sand.

DeRobbio took the car to Mitterman's repair shop two or three days later. The car smelled like gasoline and there were problems with the brakes. The driver's seat felt funny since it was turned at an angle. Although the steering wheel was painted black, orange or reddish paint was peeking through. A spring bulged through the passenger seat. The motor for the convertible top was not connected and the back window was foggy, scratched, and in poor condition. The headers were

approximately two inches from the ground and the exhaust was two to three and a half inches from the ground. When DeRobbio turned off the engine, the fan was blowing on high and could not be turned off.

DeRobbio contacted Foxx and was told that Danberry would discuss the problems with him when he returned from a car show. DeRobbio tried to discuss individual items with Foxx, but Foxx accused him of nitpicking. When he didn't get a return call from Danberry, DeRobbio contacted an attorney friend who wrote a letter giving Foxx the option of repairing the vehicle, having DeRobbio return the vehicle for a full refund, or paying for the repairs at Mitterman's shop. The company agreed to make the repairs. The car was to be picked up no later then January 15, 2000 and returned no later than April 15, 2000. DeRobbio sent Danberry a checklist of items needing repair, including rusted frame rails.

The car was picked up for repairs and returned on July 18. DeRobbio was happier with the cosmetic appearance since the problems with the paint had been corrected, a new headlight had been installed, and the car sported a new convertible top. However, the brakes were still not working. The delivery driver called Foxx, and DeRobbio told him that the brakes were not working. An agreement was ultimately reached whereby Mitterman would try to fix the brakes to avoid the expense of trucking the car back to El Paso. Mitterman would coordinate the repairs with Foxx and Foxx would pay for the repairs.

Mitterman repaired the brakes using a vacuum canister. He replaced the fuel filter, line, and ends since the car smelled of gasoline. Mitterman saw that the gas tank tabs had been blown off and gas was coming out of the back of the car. Since the back of the car was lower than the front, Mitterman sent the springs to be re-arched, which temporarily addressed the problem. The lug nuts were replaced along with weatherstripping, and the studs holding the adaptor in place were ground down so they would not scrape the bottom of the hood. Finally, Mitterman repaired the transmission. The repairs totaled $5,244.03. Foxx refused to pay, claiming that he could have gotten the work done for $10 an hour rather than $60 an hour.

Mitterman worked on the car again in August 2000. He replaced the thermostat, charged the bad battery, cleaned overspray, repaired the lighter, checked the fuel system, and corrected the aim of the headlights. The total cost of repairs was $180.29. At that point, DeRobbio was still not driving the vehicle due to the gas smell and the erratic running of the engine. He tried to get in touch with Ultimate Rides, but his calls were not returned. During that time, DeRobbio also had problems with the steering. After reading an article in Mopar Magazine, he learned what the problem was and ordered the corrective part. DeRobbio called Foxx to let him know about the part, and Foxx had experienced the same problem with his own car. Nevertheless, he was upset that DeRobbio had paid retail when Foxx could have gotten the part at wholesale.

For a while, DeRobbio held off until he could get the funds together for repairs. But as he pulled the car out of the garage one day to reach the lawnmower, the engine started making a crazy noise and the back wheels chirped. It was like someone pulled the wheels off the driver's seat, and DeRobbio hit the floor. The center of the car went down and started sliding forward, and DeRobbio had no control over the steering. The car collapsed in the middle. DeRobbio hit his wife's car in the driveway and almost hit his daughter.

After the collapse, the car was taken to Mitterman's. DeRobbio had more work done on the engine at a cost of $3,000. He also received an estimate of $10,496.54 for repairs needed to put the car back together. The work had not been done, but DeRobbio had given Mitterman a $5,000 down payment on the repairs.

Pieces of the rusty frame of the car were examined at trial. Danberry had told DeRobbio that the rails were replaced when the car was sent back to Ultimate Rides for the initial repairs. By the time of trial, Foxx had not paid Mitterman for any of the repairs nor had they reimbursed DeRobbio for any expenses. DeRobbio paid Ultimate Rides $60,807.99, which included the $58,857.99 for the car and restoration and $1,950 for extra options. He had also paid $619 for a steering box, $30 for a tire, $180 in repairs by Finelines, $5,244.03 in repairs by Mitterman, $13 for a radio manual, $1,104 for items not received and not reimbursed, the $5,000 deposit to Mitterman, $1,500 for engine repair, $246.98 in shipping for the rails, $1,556.96 to JTL Motor Company, and $12,021 in attorney's fees and costs of court for a total of $88,568.

The jury found that Foxx had breached the contract and awarded past damages of $60,587.77 and future damages of $5,496.54. The trial court entered judgment in the amount of $66,083.

## SUFFICIENCY AS TO DAMAGES

■ In Point of Error One, Foxx complains that the damages are not supported by legally and factually sufficient evidence. While he does not challenge the award of future damages, he argues that the past damage award of $60,587.77 was excessive by at least $46,500.14. We must regrettably conclude that error has been waived.

■ In order to preserve a challenge to the legal sufficiency of the evidence to support a jury's award of damages, a party must do one of the following: (1) file a motion for instructed verdict; (2) object to the submission of a jury question; (3) file a motion for judgment notwithstanding the verdict; or (4) file a motion for new trial. *Cecil v. Smith,* 804 S.W.2d 509, 510–11 (Tex.1991); *Salinas v. Fort Worth Cab & Baggage Co., Inc.,* 725 S.W.2d 701 (Tex. 1987); *Aero Energy, Inc. v. Circle C Drilling Company,* 699 S.W.2d 821 (Tex.1985). In order to preserve a factual sufficiency challenge to a jury's damage award, a party must file a motion for new trial. Tex. R.Civ.P. 324(b)(2), (4); *Kratz v. Exxon Corp.,* 890 S.W.2d 899, 902 (Tex.App.-El Paso 1994, no writ).

Foxx did not file a motion for instructed verdict or a motion for judgment notwithstanding the verdict, nor did he object to submission of a jury question. While he did file a motion for new trial, the motion addressed only the violation of a motion in limine, not the insufficiency of the evidence. Because Foxx has failed to preserve error for our review, we overrule Point of Error One.

## TESTIMONY REGARDING REPAIR EXPENSES

In Point of Error Two, Foxx complains that the trial court erred by permitting DeRobbio to testify that various repair expenses were reasonable because he was not qualified to give that opinion.

### *Standard of Review*

■ We review evidentiary complaints regarding admission of opinion testimony under an abuse of discretion standard. *See Syndex Corp. v. Dean,* 820 S.W.2d 869, 873 (Tex.App.-Austin 1991, writ denied). The test for abuse of discretion is whether the trial court acted without reference to guiding rules or princi-

ples. *See E.I. du Pont de Nemours & Co., Inc. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995).

### Preservation of Error

Foxx did not object during DeRobbio's direct examination concerning repair expenses he incurred. On redirect, DeRobbio was asked whether the expenses he incurred were reasonable. Foxx objected, arguing that DeRobbio was not qualified to testify as to reasonableness. The court sustained the objection and asked that the question be rephrased. DeRobbio was then asked whether in his personal opinion the expenses were reasonable. Foxx did not object. Since Foxx did not renew his objection to DeRobbio's opinion testimony, he has not properly preserved his complaint for our review. *See* Tex.R.App.P. 33.1(a). Even had he done so, however, we would find no abuse of discretion by the trial court in admitting the testimony.

### Testimony as to Repair Expenses

A party seeking recovery for the cost of repairs must prove their reasonable value. *Fort Worth Hotel Ltd. P'ship v. Enserch Corp.,* 977 S.W.2d 746, 762–63 (Tex.App.-Fort Worth 1998, no pet.). Ordinarily, to establish the right to recover costs of repairs, it is not necessary for a claimant to use the words "reasonable" and "necessary;" a claimant need only present sufficient evidence to justify a jury's finding that the costs were reasonable and the repairs necessary. *Id.* Receipted bills are admissible to show what the injured party actually paid for repairs. *Allright, Inc. v. Lowe,* 500 S.W.2d 190, 192 (Tex.Civ.App.-Houston [14th Dist.] 1973, no writ). However, mere proof of amounts charged or paid does not raise an issue of reasonableness and such amounts ordinarily cannot be recovered without evidence showing the charges were reasonable. *Fort Worth Hotel,* 977 S.W.2d at 762–63.

One can testify as to the value of his own car. *Calvert Fire Ins. Co. v. McClintic,* 267 S.W.2d 568, 570 (Tex.Civ. App.-Waco 1954, writ ref'd n.r.e.). In addition, any layman who can testify that he knows the value of automobiles and can give satisfactory facts in support of the statement that he has such knowledge is qualified to testify. *Id.* If an owner familiarizes himself with the reasonable costs of repairing his vehicle, he may offer his opinion as to those costs. *Int'l Srvs. Ins. Co. v. Hanna,* 515 S.W.2d 175, 176 (Tex. Civ.App.-Eastland 1974, no writ).

DeRobbio has been a car enthusiast since high school. He has previously restored a 1967 Corvette. When he became interested in purchasing a Barracuda, he began scouring local newspapers looking for a car. He had reviewed magazine articles detailing the restoration of cars, specifically including the Barracuda. Repair receipts were admitted into evidence, showing the actual costs incurred and estimates detailing the costs associated with future repairs. Since DeRobbio had familiarized himself with the reasonable costs of repairing his vehicle and submitted receipts from actual costs incurred and estimates for future costs to be incurred, we find no abuse of discretion in the admission of his opinion that the repairs were reasonable. *See Allright,* 500 S.W.2d 190, 191–92. We overrule Point of Error Two and affirm the judgment of the trial court.